**TELECHECK SERVICES, INC., Appellant**

v.

**Rodney R. ELKINS, Appellee.**

**No. 05–06–00085–CV.**

Court of Appeals of Texas, Dallas.

May 30, 2007.

---

Julie C. Guzzo, Daw & Ray, P.C., Keith Wier, Kandy E. Messenger, Barron, New-

burger, Sinsley & Wier, PLLC, Houston, for Appellant.

Rodney R. Elkins, Rodney R. Elkins & Co., Dallas, pro se.

Before Justices MORRIS, FRANCIS, and MAZZANT.

## OPINION

Opinion by Justice FRANCIS.

Rodney R. Elkins sued Telecheck Services, Inc. after various merchants declined his checks after Telecheck disapproved them. Following a three-day trial, a jury found in Elkins's favor on his negligence, defamation, and Federal Fair Credit Reporting Act (FCRA) claims. The jury awarded actual damages on each cause of action and also awarded $50,000 in exemplary damages. After a separate hearing, the trial court determined Elkins, an attorney representing himself, was entitled to attorney's fees and ultimately awarded judgment to Elkins for actual damages, exemplary damages, and attorney's fees.

In four issues on appeal, Telecheck generally complains (1) the trial court improperly awarded a double recovery and prejudgment interest on attorney's fees and exemplary damages; (2) the evidence is factually insufficient to support the malice finding and exemplary damages; and (3) the trial court erred in denying its motion for directed verdict on the federal statutory violations. We conclude there is not factually sufficient evidence of a clear and convincing nature to support the jury's malice finding. Because the exemplary damages are predicated on this finding and because the malice and exemplary issues are not separable from the remainder of the case, we reverse the trial court's judgment and remand for further proceedings consistent with this opinion. *See* TEX. R.APP. P. 44.1(b); *see Williams v. LifeCare Hosps. of N. Tex., L.P.,* 207 S.W.3d 828, 832 (Tex.App.-Fort Worth 2006, no pet.); *see also Ford Motor Co. v. Miles,* 967 S.W.2d 377, 390 (Tex.1998) (Gonzalez, J. concurring, joined by Hecht and Abbott, JJ).

Telecheck advises merchants on whether to accept bank checks as a form of payment based on information maintained in its database of the check writing history of the check writer. In May 1999, Rodney Elkins wrote a check to an Albertson's grocery store, and Telecheck disapproved the check. Despite Telecheck's disapproval, the store manager accepted Elkins's check. The cashier gave Elkins a courtesy card with Telecheck's name and telephone number. Once Elkins arrived home, he called Telecheck but said the customer service representative demanded "a whole series of information" from him that he considered "intrusive and unnecessary to the check-writing process." When Elkins refused to provide most of the information (such as his Social Security number), the representative told Elkins she could not help him. Elkins then wrote a letter to Telecheck in which he provided his name and address, explained what happened at Albertson's, and requested all information "positive or negative" that Telecheck had on him or any of his accounts, and specifically, the information that was provided to Albertson's. Telecheck did not respond to the letter.

Seven months later, in December 1999, four merchants declined Elkins's checks, and he wrote to Telecheck each time. Again, he did not receive a response. Finally, in late November 2000, Elkins was declined again. This time, Elkins sent a letter to Telecheck by certified mail, return-receipt requested. The letter demanded that Telecheck "correct and retract any incorrect or derogatory information" that it was publishing about him, causing merchants to refuse his

checks. Additionally, he requested Telecheck to "pull and provide to me all information, positive or negative" that it had on him or any of his bank accounts and to provide the information within ten days.

A few weeks later, Elkins received a form letter from Telecheck stating that his driver's license/ID number or banking numbers had been associated with a file in its database of another party and that Telecheck had disassociated Elkins's "numbers" from any file containing negative information. The letter stated that Elkins's "file currently reflects a favorable status and contains no derogatory information." It also stated that Elkins should have no "further checkwriting difficulties relating to the aforementioned matter." Telecheck did not respond to Elkins's request for information in his file.

A short time after receiving Telecheck's letter, Elkins attempted to write a check to a Telecheck merchant and was declined. Elkins then filed suit against Telecheck and mailed a copy of the petition to its president. Soon after the suit was filed, yet another merchant declined Elkins's check on the basis of Telecheck information.

Stephen Moore, the corporate representative for Telecheck, explained how the Telecheck system generally works. He testified that merchants are set up to process either the driver's license number or bank account, or both, of consumers writing checks. The number is linked up to the database, and if there is no negative information, Telecheck will approve the check. If there is negative information, however, such as a debt, Telecheck will not approve the check. If additional information is needed, the merchant is alerted that it needs to call Telecheck so that the check can be manually processed. If a consumer's check is declined, the consumer is given a courtesy card so that he/she can contact Telecheck directly. To safeguard a consumer's information, Telecheck requires certain information when answering complaints so that it can verify the consumer's identity.

In the case of Elkins, Moore testified that Telecheck did not receive any letters from Elkins until November 2000. Once it received that letter, the claim was investigated and it was determined that Elkins's driver's license number was linked to another person who had negative information in the database. Specifically, Elkins's driver's license number was imprinted on a woman's check that was returned for insufficient funds. Moore said he delinked Elkins's driver's license and bank account from the woman's information, and Elkins was notified the problem was resolved. Moore testified that when Elkins was again declined, he had written a check on a bank account for which Telecheck had no knowledge. Because Telecheck did not have that account number, Moore explained that it could not delink any information to it. However, Moore acknowledged that Telecheck did not warn Elkins in its letter of the possibility of further problems if the consumer had more than one bank account. Moreover, he said it was an "oversight" that Telecheck did not provide the information requested Elkins in his letter.

Moore testified that a good consumer's information can get linked to a negative file through keying errors by merchants or Telecheck employees. He acknowledged that Telecheck "is not a perfect corporation" and "makes mistakes, has oversights" from time to time. He explained that in 2002, Telecheck had 375,000 merchant locations and processed 3.6 billion transactions. Because of its "size and volume of the transactions," Moore said there is no way to prevent problems before they occur

and described Telecheck's system as "reactionary." However, he testified that Telecheck had to follow federal guidelines and procedures once alerted to a problem. To correct these problems, however, Moore said Telecheck had to have certain information, and "if all the information is not given to us up front," it cannot correct the problem. Moore testified that in its peak season (from October through January), it received 1500 to 2000 letters per month, but not all of the letters are complaints. No evidence was adduced regarding the number of calls received.

After hearing the evidence, the jury found (1) Telecheck's negligence proximately caused the decline of Elkins's checks and attributed 60 percent of the negligence to Telecheck and 40 percent to Elkins; (2) Telecheck violated the FCRA; and (3) Telecheck defamed Elkins. The jury awarded $5,500 in damages for past mental anguish, past shame and humiliation, and past injury to character, reputation and feelings; found that Elkins's harm resulted from malice and awarded $50,000 in exemplary damages; awarded $200 for mental anguish as damages for the negligent violation of the FCRA; and awarded $300 for the willful violation of the FCRA. After considering post-judgment motions, the trial court ultimately awarded $5,500 in actual damages, $50,000 in exemplary damages, and attorney's fees. Telecheck appealed.

We begin with Telecheck's third issue in which it argues the evidence is factually insufficient to support the jury's findings on malice and exemplary damages. For the jury to award exemplary damages, Elkins was required to prove by clear and convincing evidence that the harm to him was caused by malice on Telecheck's part.

See TEX. CIV. PRAC. & REM.CODE ANN. § 41.003(a)(2) (Vernon Supp.2006).

An appellate court making a factual sufficiency review of a malice finding must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing and ask whether sufficient evidence was presented to produce in the mind of a reasonable factfinder a firm belief or conviction as to the matter required to be proven. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002); *In re C.H.*, 89 S.W.3d 17, 25 (Tex.2002). We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *In re J.F.C.*, 96 S.W.3d at 266.

Under current law, "malice" is defined as "a specific intent by the defendant to cause substantial injury or harm to the claimant." TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7) (Vernon Supp.2006). When this case was filed, however, the statutory definition of "malice" included an alternative gross negligence component. In accordance with the applicable law,[1] the jury charge defined malice as:

(a) a specific intent by Telecheck to cause substantial injury to Rodney Elkins; or

(b) an act or omission by Telecheck,

    (i) which, when viewed objectively from the standpoint of the actor at the time of its occurrence, involved an extreme degree of risk, consid-

---

1. Because Elkins's cause of action was filed prior to the 2003 amendment, the trial court correctly instructed the jury on the two-part, pre–2003 definition of malice. *See* Act of June 11, 2003, 78th Leg., R.S., ch. 204, § 23.02(d), 2003 Tex. Gen. Laws 847, 898.

ering the probability and magnitude of the potential harm to others; and

(ii) of which Telecheck had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

On appeal, Elkins does not argue Telecheck had the specific intent to cause him injury and, at oral argument, specifically stated he was "not suggesting intent to harm." Therefore, we limit our review to whether there is factually sufficient evidence of a clear and convincing nature of the gross negligence component of the malice definition. The malice question was premised on both an affirmative finding to either the negligence or defamation question and an award of damages "that resulted from the decline of the checks." Accordingly, when considering the gross negligence prong, we focus on Telecheck's conduct that resulted in the decline of Elkins's checks. This prong contains both an objective and subjective component.

Elkins argues the malice finding can be sustained because there was evidence that Telecheck reacted to errors, rather than having a system in place to prevent errors, and failed to take seriously the errors in the system even after they became known. We agree there was evidence that Telecheck "makes mistakes, has oversights" and thus was subjectively aware of the risk that consumers could be declined because of incorrect information. But this evidence goes only to the subjective prong of malice. Malice also requires clear and convincing evidence that Telecheck's act or omission, when viewed objectively from Telecheck's standpoint, involved an "extreme degree of risk."

Extreme risk does not mean a remote possibility of injury or even a high probability of harm, but rather the likelihood of serious injury. *Dillard Dep't Stores, Inc. v. Silva,* 148 S.W.3d 370, 373 (Tex.2004). This objective element is the distinguishing feature between conduct which is deserving of punishment and that which merely demands restitution. *Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 326 (Tex.1993).

After reviewing the evidence, we cannot conclude there was factually sufficient evidence that Telecheck's conduct, viewed objectively from its standpoint, involved an extreme risk. The evidence showed that Telecheck in the peak season, from October through January, received 1500 to 2000 letters per month, and not all were complaints. No evidence was adduced as to the number of calls or, more importantly, the number of calls that ultimately showed a consumer's information was incorrect or linked to another party with negative information. Importantly, the evidence did show that Telecheck processed 3.6 billion transactions in 2002. In analyzing this issue from Telecheck's perspective at the time, as we are required to do, without resorting to hindsight, we cannot conclude a factfinder could reasonably form a firm conviction or belief that Telecheck's conduct exposed Elkins to an extreme risk of substantial harm. *See Dillard Dep't Stores,* 148 S.W.3d at 373.

To the extent Elkins argues that the exemplary damage award can be sustained based on the jury's finding that Telecheck violated the FCRA, we disagree. The jury was not asked to determine an amount of exemplary damages based on Telecheck's violation of the FCRA. Rather, Question 8, the exemplary damage issue, was predicated on an affirmative finding to Question 7, the malice issue, which in turn was predicated on the liability findings on defamation and negligence, not the findings relat-

ed to the federal statute. We sustain the third issue.

■ In its fourth issue, Telecheck argues the trial court erred in denying its motion for directed verdict on the issue of the FCRA violations because the cause of action was not pleaded and Elkins did not obtain a trial amendment. Within this issue, Telecheck has not provided a single citation to the record or to any legal authority as is required by the Texas Rules of Appellate Procedure. *See* TEX.R.APP. P. 38.1(h). Because Telecheck has failed to do so, the issue is inadequately briefed and presents nothing for review. *See In re A.W.P.*, 200 S.W.3d 242, 244 (Tex.App.-Dallas 2006, no pet.).

Having determined the exemplary damage award must be reversed, we must now consider the appropriate disposition in this case. Texas Rule of Appellate Procedure 44.1(b) allows this Court to order a partial remand only if the error affects part of the judgment and that part is separable without unfairness to the parties. *See* TEX. R.APP. P. 44.1(b). However, the issues of malice and exemplary damages are not separable from the remainder of the case. *See Williams*, 207 S.W.3d at 832; *see also Ford Motor Co.*, 967 S.W.2d at 390 (Gonzalez, J. concurring, joined by Hecht and Abbott, JJ). Because our disposition of the third issue requires that the entire case be remanded for a new trial, we do not address Telecheck's remaining issues in which it complains of a double recovery and prejudgment interest. *See* TEX.R.APP. P. 47.1.

We reverse the trial court's judgment and remand for further proceedings consistent with this opinion.