IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 25, 2007 Session Heard at Maryville[1]


**JEREMY FLAX ET AL. v. DAIMLERCHRYSLER CORPORATION ET AL.**

**Appeal by Permission from the Court of Appeals, Middle Section**
**Circuit Court for Davidson County**
**No. 02C-1288    Hamilton V. Gayden, Jr., Judge**

———————————

**No. M2005-01768-SC-R11-CV - Filed July 24, 2008**

———————————

WILLIAM C. KOCH, JR., J., concurring in part and dissenting in part.

The Court has decided to uphold a judgment for $18,367,345 in compensatory and punitive damages arising out of the death of an eight-month-old child in a collision between a minivan and a truck. While the parents' loss of their child is heart-wrenching and tragic, I cannot concur in affirming the awards of either compensatory or punitive damages against the manufacturer of the minivan in which the child was a passenger. The child's parents are not entitled to $13,367,345 in punitive damages because they have failed to present clear and convincing evidence that the manufacturer acted recklessly in the design, construction, or marketing of the minivan. They are likewise not entitled to recover $5,000,000 in compensatory damages because of the erroneous admission of evidence regarding twenty-five "similar incidents" occurring after the date that the minivan was sold. Accordingly, rather than approving the award of $18,367,345 in compensatory and punitive damages, I would remand the case for a new trial on the issue of compensatory damages only.


**I.**

In June 2001, Jim and Sandra Sparkman resided in Kingston Springs, Tennessee with their adult daughter, Rachel Sparkman, and Joshua Flax, Rachel Sparkman's eight-month-old son. The Sparkmans owned a 1998 Dodge Caravan minivan manufactured by DaimlerChrysler Corporation ("DaimlerChrysler"). On the morning of June 30, 2001, shortly after Mr. Sparkman turned left onto Old Charlotte Pike from a private driveway, a truck being driven by Louis A. Stockell, Jr. crashed into the rear of the Sparkmans' minivan. Mr. Stockell's truck was traveling between fifty and fifty-five miles per hour despite a thirty-five mile per hour speed limit. The force of the collision

———————————

[1]Oral argument was heard in this case in Maryville, Blount County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

propelled the minivan off the roadway, up a small hill, and head-on into a tree.[2] The minivan's rear bumper sustained almost two feet of crash damage, and the force of the collision jammed the doors shut.

When the collision occurred, Mr. Sparkman was in the driver's seat, and another adult passenger was in the front passenger's seat. Rachel Sparkman was seated in a captain's chair style seat immediately behind her father, and Joshua Flax was strapped in a forward-facing baby seat in the captain's chair style seat immediately behind the front passenger seat. Two other adults were seated in a third row of seats. None of the adults in the minivan were seriously injured. However, Joshua Flax sustained severe head injuries when the collision caused the back of the seat in front of him to yield backward and to strike him on the head. Joshua Flax died at the hospital the following day.

On May 7, 2002, Rachel Sparkman and Jeremy Flax,[3] along with the Sparkmans filed a complaint in the Circuit Court for Davidson County against DaimlerChrysler and Mr. Stockell. Of particular relevance to this appeal, Rachel Sparkman and Jeremy Flax sought to recover compensatory and punitive damages for the wrongful death of Joshua Flax.[4] For her own part, Rachel Sparkman also sought compensatory and punitive damages for negligent infliction of emotional distress.

The trial before a Davidson County jury began on November 3, 2004. On November 22, 2004, the jury returned a verdict finding that both DaimlerChrysler and Mr. Stockell were fifty percent at fault for Joshua Flax's death and for Ms. Sparkman's emotional injuries. The jury returned a $5,000,000 verdict on the wrongful death claim and a $2,500,000 verdict on Ms. Sparkman's negligent infliction of emotional distress claim. The jury also decided that DaimlerChrysler had acted recklessly and, therefore, that DaimlerChrysler could be required to pay punitive damages. The jury retired to deliberate further and, on November 23, 2004, returned a verdict against DaimlerChrysler awarding $66,500,000 in punitive damages on the wrongful death claim and $32,500,000 in punitive damages on Ms. Sparkman's negligent infliction of emotional distress claim.

DaimlerChrysler filed the usual post-trial motions challenging both the awards of compensatory damages and the awards of punitive damages. On July 11, 2005, the trial court filed a final order and judgment affirming the compensatory damages awards. Exercising its authority

_____

[2]Mr. Stockell's truck also veered off the road and followed the minivan up the hill. After the minivan struck the tree, Mr. Stockell's truck collided with the rear of the minivan a second time.

[3]Jeremy Flax is Joshua Flax's biological father.

[4]The wrongful death claims included allegations that DaimlerChrysler was negligent in the design, manufacture, and sale of the minivan and that the front seats in the minivan were defective and unreasonably dangerous. Rachel Sparkman and Jeremy Flax also alleged that DaimlerChrysler had violated its post-sale duty to warn owners about the defective and dangerous seats in the minivan. They also alleged that DaimlerChrysler knew that the seats were dangerous but had recklessly failed either to correct them or to warn the minivan owners of the danger.

under *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992), the trial court reduced the punitive damages award on the wrongful death claim from $66,500,000 to $13,367,345 and the punitive damages award on Ms. Sparkman's negligent infliction of emotional distress claim from $32,500,000 to $6,632,655.

DaimlerChrysler, as well as Ms. Sparkman and Mr. Flax, appealed to the Court of Appeals. Following oral arguments in July 2006, the appellate court filed a lengthy and detailed opinion on December 27, 2006. *Flax v. DaimlerChrysler Corp.*, No. M2005-01768-COA-R3-CV, 2006 WL 3813655 (Tenn. Ct. App. Dec. 27, 2006). The Court of Appeals affirmed the $5,000,000 award of compensatory damages for the wrongful death of Joshua Flax. However, the court reversed the compensatory and punitive damage awards for Ms. Sparkman's negligent infliction of emotional distress claim because Ms. Sparkman had failed to present expert evidence that she had sustained serious and severe emotional injuries. The appellate court also reversed the $13,367,345 award for punitive damages for the wrongful death of Joshua Flax after concluding that Rachel Sparkman and Jeremy Flax had failed to present clear and convincing evidence that DaimlerChrysler had acted recklessly.

We granted Rachel Sparkman's and Jeremy Flax's application for permission to appeal to review the Court of Appeals' decision to dismiss Ms. Sparkman's claim for negligent infliction of emotional distress and to reverse the $13,367,345 award for punitive damages for the wrongful death of Joshua Flax. In accordance with Tenn. R. App. P. 13(a), DaimlerChrysler has also asserted that it is entitled to a new trial on the wrongful death claim.

The Court has now determined that the Court of Appeals properly reversed the awards for compensatory and punitive damages for Ms. Sparkman's negligent infliction of emotional distress claim. The Court has also affirmed the $5,000,000 award of compensatory damages and has reinstated the $13,367,345 award of punitive damages for the wrongful death of Joshua Flax. While I concur fully with the reasoning and the result of the Court's disposition of the negligent infliction of emotional distress and post-sale failure to warn claims, I cannot concur with the decision to affirm the awards of compensatory and punitive damages on the wrongful death claims.

## II.
### THE PUNITIVE DAMAGES AWARD

Punitive damages have been awarded by Tennessee's courts for almost one hundred and seventy years.[5] Their two-fold purpose is to punish wrongful conduct and to deter others from engaging in similar conduct in the future. *Miller v. United Automax*, 166 S.W.3d 692, 697 (Tenn. 2005); *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 906-07 (Tenn. 1999). As salutary as these purposes are, the courts have recognized that awards of punitive damages pose an acute danger of

---

[5]*Wilkins v. Gilmore*, 21 Tenn. (2 Hum.) 140, 141 (1840). By 1870, punitive damages awards were so well-established, that this Court, despite its strong misgivings, declined to discontinue them. *Dougherty v. Shown*, 48 Tenn. (I Heisk.) 302, 305-06 (1870). During this time, punitive damages have been referred to as "exemplary damages," "vindictive damages," and "smart money." *Liberty Mut. Ins. Co. v. Stevenson*, 212 Tenn. 178, 180, 368 S.W.2d 760, 761 (1963).

arbitrary deprivation of property, *Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 (1994), and that they have a devastating potential for harm when imposed indiscriminately, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003) (quoting *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 42 (1991) (O'Connor, J., dissenting)).

Sixteen years ago, this Court, acknowledging the potential difficulties with punitive damages awards, limited the circumstances in which punitive damages could be awarded and prescribed procedures to assure that punitive damages were not arbitrarily and capriciously awarded. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992). We recognized that punitive damages could be a deterrent against "truly reprehensible conduct," *Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 901, and thus we limited punitive damages awards to circumstances in which the defendant has acted intentionally, fraudulently, maliciously, or recklessly. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 901.

At the same time that we circumscribed the circumstances in which punitive damages could be awarded, we prescribed four procedures designed to assure that punitive damages, when warranted, were imposed in only the "most egregious cases" and then, in a manner consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 8 of the Constitution of Tennessee. *See Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 900-02. These procedures include: (1) a bifurcated trial,[6] (2) a heightened burden of proof,[7] (3) specific instructions,[8] and (4) independent judicial oversight over punitive damages awards.[9] This case requires consideration of the plaintiff's heightened burden of proof and the courts' oversight of punitive damages awards.

We decided in *Hodges v. S. C. Toof & Company* that plaintiffs seeking punitive damages must present "clear and convincing evidence" that the defendant's acts that caused their injury were intentional, fraudulent, malicious, or reckless. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 901 & n.3. The clear and convincing evidence standard requires that the truth of the proposition sought to be established by the evidence be highly probable. *Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 341 (Tenn. 2005). Clear and convincing evidence leaves no serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 901 n.3. Thus, clear and convincing evidence produces in the fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re Tiffany B.*, 228 S.W.3d 148, 155-56 (Tenn. Ct. App. 2007); *Hibdon v. Grabowski*, 195 S.W.3d 48, 63 (Tenn. Ct. App. 2005); *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985).

---

[6] *Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 901.

[7] *Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 901.

[8] *Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 901-02.

[9] *Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 902.

Giving juries discretion to award punitive damages creates the potential that juries will use their verdicts to express biases against big businesses, especially ones without a strong local presence. *Honda Motor Co. v. Oberg*, 512 U.S. at 432. Accordingly, in *Hodges v. S.C. Toof & Company*, we required the trial courts to review punitive damages awards differently than the way they customarily review jury verdicts and compensatory damages awards. Rather than performing their traditional task as the thirteenth juror, we directed trial courts to "review the award, giving consideration to all matters on which the jury is required to be instructed." *Hodges v. S. C. Toof & Co.*, 833 S.W.2d at 902. We also directed trial courts to "clearly set forth the reasons for decreasing or approving all punitive awards in findings of fact and conclusions of law demonstrating a consideration of all factors on which the jury is instructed." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d at 902.

Because punitive damages awards are different, they also require a different standard of appellate review. This standard of review consists of two steps.

A heightened burden of proof requires a heightened standard of appellate review.[10] Accordingly, the first step in reviewing a punitive damages award on appeal is to review the record to determine whether it contains material evidence that supports a finding by clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously, or recklessly.[11] *See, e.g., Buell-Wilson v. Ford Motor Co.*, 73 Cal. Rptr. 3d 277, 312 (Ct. App. 2008); *Budget Car Sales v. Stott*, 662 N.E.2d 638, 639 (Ind. 1996); *York v. InTrust Bank, N.A.*, 962 P.2d 405, 429 (Kan. 1998); *Flippo v. CSC Assocs. III, L.L.C.*, 547 S.E.2d 216, 223 (Va. 2001). At this stage, the appellate court must determine whether the jury could reasonably have been persuaded that the required factual findings were proved to be highly probable. *Shrader-Miller v. Miller*, 855 A.2d 1139, 1145 (Me. 2004). Stated another way, the appellate court must ask whether sufficient material evidence was presented to produce in the mind of a reasonable fact-finder a firm belief or conviction as to the matters required to be proven. *Telecheck Servs., Inc. v. Elkins*, 226 S.W.3d 731, 735 (Tex. Ct. App. 2007). Any lesser standard of review dilutes the sixteen-year-old requirement that plaintiffs seeking punitive damages must prove by clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously, or recklessly.[12]

If the appellate court determines that the plaintiff has proved by clear and convincing evidence that it is entitled to punitive damages, the second step of the appellate review process requires the appellate court to engage in an exacting appellate review to ensure that the punitive damages award is based on an application of the law rather than the decision-maker's caprice. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. at 418. Rather than being deferential to the trial

[10]*Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004).

[11]*Cf. Shell v. Law*, 935 S.W.2d 402, 405 (Tenn. Ct. App. 1996) (stating that "when we reach issues requiring the evidence to be clear, cogent and convincing, [we will] examine the record to determine if there is sufficient proof to constitute clear, cogent and convincing evidence to support the findings of the jury.").

[12]*Hodges v. S. C. Toof & Co.*, 833 S.W.2d at 901.

court, *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 440 (2001), this review must be "independent." *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. at 435.

At this stage of the review, the appellate court must engage in an independent, de novo evaluation of the three "guideposts" for punitive damages first required in *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996). *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. at 418; *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. at 436. These guideposts include (1) the degree of reprehensibility of the defendant's conduct, (2) the disparity between the actual and potential harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *BMW of N. Am., Inc. v. Gore*, 517 U.S. at 575.

An award of punitive damages is an expression of moral condemnation. *Copper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. at 432. The purpose of this exacting appellate review is to assure that the defendant's conduct is the "most egregious of wrongs," *Cf. Cambio Health Solutions, LLC v. Reardon*, 213 S.W.3d 785, 792 (Tenn. 2006), and that it is so reprehensible that it must be both punished and deterred. *Cf. Culbreath v. First Tenn. Bank Nat'l Ass'n*, 44 S.W.3d 518, 528-29 (Tenn. 2001); *Metcalfe v. Waters*, 970 S.W.2d 448, 450 (Tenn. 1998). Using these principles, respectfully, it is my view that this case is neither close nor difficult. Ms. Sparkman and Mr. Flax have failed to prove by clear and convincing evidence that DaimlerChrysler acted so recklessly with regard to the design, construction, and marketing of the 1998 Dodge Caravan that it should be punished by an award of punitive damages.

At the time the 1998 Dodge Caravan was designed and manufactured, there was a genuine principled debate in the automotive community regarding just how rigid or stiff car seatbacks should be. Some, like the plaintiffs' witness, Kenneth Saczalski , favored using seats that were more rigid than the seats that were generally being used in American vehicles. Others, like DaimlerChrysler, were wary of using more rigid seats because of their concern that making the front seats more rigid would expose the occupants of a vehicle to other, equally serious injuries. Accordingly, balancing the risks presented by impact occurring from various directions, DaimlerChrysler designed the front seats of the minivan to yield in a controlled manner in the event of a rear impact.

The evidence showed that the design of car seats is a complex engineering issue that requires reasonable safety trade-offs. In fact, the National Highway Traffic Safety Administration issued a report while this trial was in progress that stated: "Improving seating system performance is more complex than simply increasing the strength of the seatback. A proper balance in the seatback strength and compatible interaction with head restraints and seat belts must be obtained to optimize injury mitigation." Neither the industry nor the government regulators have sided with Dr. Saczalski's proposals.

All the witnesses, including those testifying for DaimlerChrysler, stated that the FMVSS 207[13] standard that had been in place for thirty years was inadequate. Accordingly, when DaimlerChrysler designed and built the 1998 Dodge Caravan, it set goals for seat strength that doubled the standards in FMVSS 207. The seat that DaimlerChrysler actually designed and installed in the 1998 Dodge Caravan exceeded even DaimlerChrysler's internal standards. It was essentially undisputed that the front seats in this minivan were "mainstream" seats, that is, that they were very similar to almost every other front outboard seat in similar vehicles.

There is no question that persons have been injured riding in the Dodge Caravan. The trial court determined that out of the 7,000,000 minivans that had been sold, there were thirty-seven similar incidents. However, all of the witnesses testified that automobiles should be designed in a way that enables them to be as safe as possible in light of the innumerable ways in which accidents can occur. While DaimlerChrysler may not have satisfied Dr. Saczalski, its seats were triple the strength required by FMVSS 207, and they exceeded the strength of many other automobile seats.[14] On these objective facts,[15] I find it difficult to conclude that the

_____

[13]49 C.F.R. § 571.207 (2007). The purpose of this standard is to establish "requirements for seats, their attachment assemblies, and their installation to minimize the possibility of their failure by forces acting on them as a result of vehicle impact." 49 C.F.R. § 571.207, S1.

[14]A manufacturer's compliance with applicable governmental safety regulations and industry standards does not, by itself, prevent awards of punitive damages. However, evidence of a manufacturer's compliance with governmental and industry standards is evidence that the manufacturer did not recklessly disregard safety. *See*, *e.g.*, David G. Owen et al., *Madden & Owen on Products Liability* § 18.6, at 305 (3d ed. 2000); Victor E. Schwartz et al., *Guide to Multistate Litigation* § 10.07, at 202 (1985); David G. Owen, *Problems in Assessing Punitive Damages Against Manufacturers of Defective Products*, 49 U. Chi. L. Rev. 1, 40-42 (1982) [hereinafter "Owen, *Problems*"]. Many government safety standards, including the numerous standards issued by the National Highway Transportation Safety Administration, have been adopted within a "gray area where the difficulties of defining defectiveness (the 'proper' mix of safety and its tradeoffs) are especially great." Owen, *Problems*, 49 U. Chi. L. Rev. at 41-42 & n.196. The difficulty for manufacturers is heightened even further when an industry is making safety decisions upon which experts and government regulators have been unable to reach any consensus. Accordingly, decisions made within these gray areas should not generally warrant a punitive damages award. *See* Owen, *Problems*, 49 U. Chi. L. Rev. at 40-42 & n.196.

[15]The plaintiffs' evidence regarding DaimlerChrysler's recklessness includes the testimony of a former employee, Paul Sheridan, who chaired DaimlerChrysler's Minivan Safety Leadership Team. This committee was apparently created in late 1992, partially in response to an investigative story regarding the safety of car seats that had been aired on *Sixty Minutes* in February 1992. Its purpose was to advise upper level management about what needed to be done in the area of safety. Mr. Sheridan, who has been excluded from testifying regarding seatback design in other cases, *Gardner ex rel. Gardner v. Chrysler Corp.*, 89 F.3d 729, 737-38 (10th Cir. 1996), testified that he showed the *Sixty Minutes* story at a team meeting in March 1993 and that the team discussed seatback strength. He also testified that he was ordered to collect and destroy the minutes of the March 1993 meeting and that the team was disbanded in November 1994. Chrysler discharged Mr. Sheridan in December 1994 after accusing him of leaking confidential developmental testing information to *Auto World* magazine. Mr. Sheridan denied the accusation. *See Chrysler Corp. v. Sheridan*, No. 227757, 2003 WL 327714 (Mich. Ct. App. Feb. 11, 2003), *perm. app. denied*, 666 N.W.2d 668 (Mich. 2003) (Table). Mr. Sheridan's testimony may very well reflect DaimlerChrysler's over-reaction to the *Sixty Minutes* story and the existence of some internal dissension regarding how best to respond to the concerns about car seat safety raised by the story. However, taken in the context of all the evidence in this case, it does not demonstrate clearly and convincingly that DaimlerChrysler's engineers were acting recklessly when they designed a front seat for the 1998 Dodge

(continued...)

plaintiffs presented clear and convincing evidence that DaimlerChrysler acted so recklessly that the company should be punished beyond being required to pay compensatory damages.

### III.
#### THE EVIDENCE OF THE TWENTY-FIVE POST-SALE INCIDENTS

As part of the proof to support their post-sale duty to warn claim, Ms. Sparkman and Mr. Flax presented evidence regarding twenty-five incidents that occurred after the sale of the Sparkmans' minivan and that allegedly were similar to the accident that occurred on June 30, 2001. The Court has properly determined that the evidence of these incidents should not have been introduced because Ms. Sparkman and Mr. Flax cannot assert a post-sale failure to warn because they claimed that DaimlerChrysler was aware of the alleged dangerousness of the minivan's front seats before the time of the sale.[16] However, the Court has also determined that the introduction of the evidence of these twenty-five post-sale incidents was harmless error. I respectfully cannot agree.

When appellate courts conduct a harmless error analysis under Tenn. R. App. P. 36(b), they must avoid acting like a second jury by basing their analysis on their own assessment of the defendant's guilt. *State v. Rodriguez*, 254 S.W.3d 361, ___, 2008 WL 1817361, at *10 (Tenn. 2008). Rather, harmless error scrutiny focuses on the actual basis for the jury's verdict, *State v. Mallard*, 40 S.W.3d 473, 489 (Tenn. 2001), and the impact that the erroneously admitted evidence had on the jury's decision-making. *See State v. Denton*, 149 S.W.3d 1, 16-17 (Tenn. 2004). A harmless error analysis requires a careful examination of the entire record to determine whether the erroneously admitted evidence more probably than not affected the judgment or resulted in prejudice to the judicial process. *State v. Rodriguez*, 254 S.W.3d at ___, 2008 WL 1817361, at *10.

We visited the outer boundaries of the harmless error doctrine in 2004 when the Court, by a divided vote, upheld a $7,366,000 verdict in a medical malpractice case by deciding that a trial judge's critical comment regarding a key witness's credibility in the presence of the jury was harmless error. *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 134 (Tenn. 2004).[17] The Court is returning to the outer boundary between harmful and harmless error in order to uphold this $18,367,345 verdict. I cannot follow along.

Any objective reader of this voluminous record cannot help being struck by the frequency of the references in the plaintiffs' case to the other allegedly similar incidents in which persons riding

---

[15](...continued)
Caravan that was intended to yield in a controlled way when the minivan was struck from behind.

[16]The Court has not directly addressed DaimlerChrysler's argument that many of these incidents were not substantially similar to the collision that gave rise to this lawsuit. Based on my review of the record, it appears that DaimlerChrysler is correct, and thus there is a second, equally valid, basis for concluding that the admission of the evidence involving many of these incidents was error.

[17]The trial court stated in the jury's presence that the witness had changed her testimony. *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d at 144 (Drowota, C.J., dissenting).

in Chrysler minivans were injured when the seats yielded in rear end collisions. The plaintiffs' lawyers repeatedly argued to the jury that "[y]ou're going to hear about a bunch of them . . . There is no way to know for sure how many times Chrysler or DaimlerChrysler seatbacks have collapsed in wrecks" or that "the weak seatbacks . . . have killed and injured a lot of people" or that "[t]here is no evidence from DaimlerChrysler Corporation that those 37 are the only ones killed and injured."

Courts are generally cautious in the admission of similar incident evidence precisely because of the prejudice that it can carry.[18] Such evidence has been described as "extremely harmful to the defense"[19] and "highly prejudicial,"[20] and it has been noted that the presentation of repetitive accident evidence can prejudice the jury.[21]

The references to other similar incidents in this case are so numerous that a reasonable person cannot be sure what evidence eventually tipped the jury in favor of holding DaimlerChrysler liable for the wrongful death of Joshua Flax or in calculating the compensatory and punitive damages or both. It is highly unlikely that the jury was not influenced in some way by the sheer volume of these allegedly similar incidents. Under these circumstances, the jury's assessment of DaimlerChrysler's liability and the amount of damages was, more probably than not, affected by the evidence of other similar incidents that should not have been admitted.

## IV.

I do not relish the prospect of requiring these parties to try this case again. However, when reversible error infects the fact-finding process, a new trial is the only suitable remedy. For the reasons stated herein, I would reverse the judgment and remand the case for a new trial on the issue of compensatory damages only.

_____
WILLIAM C. KOCH, JR., JUSTICE

---

[18] 1 *McCormick on Evidence* § 2000m, at 800 (Kenneth S. Broun ed., 6th ed. 2006).

[19] *John Deere Co. v. May*, 773 S.W.2d 369, 374 (Tex. Ct. App. 1989).

[20] *Whaley v. CSX Transp., Inc.*, 609 S.E.2d 286, 300 (S.C. 2005).

[21] David Crump, *Evidence, Economics, and Ethics: What Information Should Jurors be Given to Determine the Amount of a Punitive-Damage Award?*, 57 Md. L. Rev. 174, 229 (1998).